## Attachment A - Stipulation of Facts

**The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proved the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.**

At all times material herein, the Maryland Department of Human Services, formerly known as the Maryland Department of Human Resources (DHR), was an agency of the State of Maryland that served as the primary social service provider for each of Maryland's twenty-four counties. The Secretary of DHR was the head of the Department and a member of the Maryland Governor's cabinet.

DHR's Office of Technology for Human Services (OTHS) was responsible for reviewing and implementing DHR's technology plans, programs, projects, budgets, staff, and purchasing. It had an annual budget of approximately $70 million.

### The DHR Hosting and Applications Contracts

In or about 2008, DHR awarded a division of Company #1 the following two prime contracts: The Outsourcing of Hosting Services Contract, OTHS/OTHS 08-002 (the Hosting Contract) and the Application Maintenance/Operations and Enhancement Services Contract, OTHS/OTHS-10-005 (the Applications Contract). These prime contracts were awarded through a competitive bidding process known as a Request for Proposal (RFP).

The Hosting Contract was a five-year, eight-month contract with the possibility of a further five-year extension if approved by DHR that was potentially worth as much as $129 million to the selected vendor. The Hosting Contract required the winning bidder to provide and support the operations of a computer data center that had sufficient capacity to house the various software applications that beneficiaries of DHR programs used to apply for and access their benefits.

The Applications Contract was a five-year, six-month contract with two different two-year extension options that could be worth up to approximately $229 million. Under the Applications Contract, the successful vendor was responsible for operating and maintaining software applications that were necessary to the delivery of public welfare benefits or the effective operation of social programs provided by the State of Maryland. The Applications Contract was divided into four subparts or "towers," which respectively had responsibility for the Client Automated Resource and Eligibility System (CARES); the Child Support Enforcement System (CSES); the Maryland Children's Electronic Social Services Information Exchange (CHESSIE); and a collection of smaller programs known collectively as the DHR Cottage Applications.

During the time period relevant to this case, defendant Coffland's co-defendant Isabel FitzGerald (FitzGerald) was an agent of the government of the State of Maryland, as well as of DHR, as set forth below:

- From in or about February 2007 to on or about October 14, 2011, FitzGerald served as the Chief Information Officer (CIO) of DHR and in that position was responsible for overseeing the day-to-day operations of OTHS.

- From at least early-to-mid December 2011 through in or about December 2012, FitzGerald had a consulting agreement with DHR whereby she continued to advise upper-level DHR officials such as the Department's CIO and its Secretary on information technology matters and through which she also interacted directly with DHR contractors, including Company #1.

- From on or about December 5, 2012 to on or about August 25, 2013, FitzGerald served as the Deputy Secretary of Operations of DHR, a position that reported directly to the DHR Secretary and that was responsible for overseeing OTHS and numerous additional offices within DHR. In late August 2013, FitzGerald was sworn in as the Secretary of the Maryland Department of Information Technology (DoIT).

Kenneth Coffland (Coffland) was a resident of Maryland and Texas and who, between in or about 2009 and in or about September 2011, worked as an employee of Company #1 in support of the Hosting Contract. In 2010, Company #1 promoted Coffland to Hosting Director, where he had overall responsibility for ensuring that Company #1's data center met its contractual obligations to DHR. Coffland's annual salary as Hosting Director in 2010-11 was approximately $171,000, plus a potential bonus of up to 20% of his salary (or roughly $35,000).

Coffland and FitzGerald came to know each other well after he began working on the Hosting Contract in 2009. By the spring of 2010, Coffland and FitzGerald had developed a close personal relationship. Notwithstanding her close personal relationship with Coffland, FitzGerald developed a negative perception of Company #1's performance in that resulted in increasingly difficult relations between her and company officials, employees, and subcontractors on the Hosting Contract.

On Friday, September 23, 2011, Coffland resigned and terminated his employment as Hosting Director with Company #1. The following Monday, September 26, 2011, Coffland started working for Company #2, which had the responsibility of reviewing Company #1's performance on the Hosting Contract on an ongoing basis. In his new position, it was Coffland's sole job to monitor and report to DHR on his previous employer's performance on the Hosting contract.

FitzGerald herself resigned from her position as DHR's CIO effective in mid-October 2011 and began operating a sole-proprietorship consulting business. Before the end of the year, however, she re-established a relationship as a paid consultant to DHR, whereby she continued to advise her replacement as the CIO and the DHR Secretary and to deal directly with state

contractors, including officials and personnel of Company #1. In this new position, FitzGerald continued dealing with matters involving the Hosting contract, and she and Coffland continued their close business and personal relationship.

In or about the fall of 2012, FitzGerald was named to be the Deputy Secretary of Operations of DHR, a position that reported directly to the DHR Secretary and that oversaw OTHS and numerous additional offices within DHR. FitzGerald thus resumed her direct employment with the State of Maryland when she commenced work as the Deputy Secretary of Operations of DHR on December 5, 2012.

In or about January 2013, while FitzGerald was Deputy Secretary of Operations of DHR, FitzGerald caused the CIO to direct Company #1 to remove the individual who then held the position of Hosting Director. Soon after, FitzGerald spoke with Company #1's account manager concerning what she considered to be Company #1's problematic performance on the Hosting Contract. During this conversation, FitzGerald communicated to Company #1's program manager that unless Company #1 resolved the issues she perceived, the State of Maryland would not exercise its option to award Company # 1 a five-year renewal on the Hosting Contract, which expired in mid-2014. In that case, the state would solicit new bids for the Hosting Contract, which would not only result in Company #1's loss of that contract's revenue, but could also have potentially serious consequences for Company #1's ability to compete for new business in other states. On the other hand, FitzGerald told Company #1's program manager that if it rehired Coffland as Hosting Director, she believed he would be able to fix the performance issues she had identified with the Hosting Contract, and that this in turn would result in Company #1's five-year renewal option being picked up by the State.

Company #1 did not want to rehire Coffland. Among other reasons, given his close and well-known personal relationship with FitzGerald, Company #1's officials did not believe that Coffland would fairly represent Company #1's interests in its dealings with the state. Instead, they believed he would take FitzGerald's side in any dispute. Nevertheless, given FitzGerald's statements to them, Company #1's officials felt obliged to offer him the position.

FitzGerald communicated to Coffland the substance of the conversation between her and Company #1's program manager. This placed Coffland in a position not only to get the job, but to negotiate terms he otherwise would have been unable to negotiate.

In or about February 2013, Company #1's account manager met with Coffland and laid out a potential compensation package for him that was a modest improvement over what he had received during his previous tenure in the Hosting Director's position. Coffland rejected this package and counter-offered with a demand of compensation, including bonuses, that substantially exceeded what he had received when he held the possession less than 18 months earlier. Coffland also demanded to be hired as an independent contractor rather than an employee, which was against Company #1's wishes because it did not allow Company #1 the level of control they held over employees versus independent contractors.

However, as a result of FitzGerald's position, Company #1's officials ultimately concluded they had no choice but to offer Coffland the job of Hosting Director as an independent

contractor with a greater compensation structure than they wanted to, notwithstanding their reluctance to do so. Company #1 therefore offered Coffland the Hosting Director's position as an independent contractor in mid-April 2013. Company #1 agreed to pay Coffland for his services at a rate of $125 per hour, up to a maximum of 2,400 annual hours – thus resulting in a potential annual salary of $300,000. In addition, Company #1 felt compelled to meet Coffland's demand for a quarterly bonus of up to $50,000.00, thus resulting in a potential annual bonus of $200,000.

When Company #1's program manager communicated its final offer to Coffland's business email at DHR on the evening of April 15, 2013, Coffland first forwarded this email to his personal email address, and then forwarded it to FitzGerald's personal email address. He and FitzGerald discussed Company #1's offer before he advised Company #1 that he would accept it. On or about July 2, 2013, Coffland reassumed the Hosting Director position as an independent contractor.

Thus, starting in or about January 2013 and continuing through mid-April 2013, FitzGerald used her official position as Deputy Secretary of DHR to pressure Company #1 to re-hire defendant Coffland as the Hosting Director on the Hosting Contract with DHR. FitzGerald used her position as an agent of the State of Maryland government to cause Company #1 to fear that it would suffer negative business consequences, including the possibility that DHR would refuse to offer Company #1 a five-year renewal when its existing contract with the State expired in 2014 – if it refused to do what she wanted. Defendant Coffland in turn used his knowledge of the pressure that FitzGerald placed on Company #1 to force it to accept salary and bonus demands that were far in excess of what he had previously received for holding the same position, and far more than what Company #1 wanted to pay him. He furthermore was able to force Company #1 to accept his demand that he be hired as an independent contractor, rather than as an employee of Company #1.

---

I have read this Statement of Facts and carefully reviewed every part of it with my attorneys. I understand it, and I voluntarily agree to it. I do not wish to change any part of it

6/7/22
Date

_Kenneth Coffland_
Kenneth Coffland

I am Kenneth Coffland's attorney. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, her decision to sign it is an informed and voluntary one.

6/7/22
Date

Gerard P. Martin, Esq.